*TERRY A. DAKE, LTD.*
11811 North Tatum Boulevard
Suite 3031
Phoenix, Arizona 85028-1621
Telephone: (480) 368-5199
Facsimile: (480) 368-5198
tdake@cox.net

**Terry A. Dake - 009656**

Attorney for Trustee

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ALEXANDER PAPAKYRIAKOU,<br>ROXANE J. PAPAKYRIAKOU,<br><br>                Debtors.<br>_____<br><br>DAVID A. BIRDSELL, TRUSTEE,<br><br>                Plaintiff,<br><br>v.<br><br>GREGORY NEAL PAPAKYRIAKOU;<br>MARC ROBERT PAPAKYRIAKOU;<br><br>                Defendants.<br>_____ | In Chapter 7 Proceedings<br><br>Case No. 2:11-BK-00003-CGC<br><br><br><br><br><br>**Adversary No. 2:12-AP-107** |

**COMPLAINT**

David A. Birdsell ("Birdsell"), as trustee of the bankruptcy estate of Alexander Papakyriakou and Roxane J. Papakyriakou, Bankruptcy Case No. 2:11-BK-00003-CGC, for his Complaint, says as follows:

       1. Birdsell is the duly appointed trustee of the bankruptcy estate of Alexander Papakyriakou and Roxane J. Papakyriakou, Bankruptcy Case No. 2:11-BK-00003-CGC (collectively "debtors"). This bankruptcy case was commenced as a voluntary proceeding under Chapter 7 on January 2, 2011.

Case 2:12-ap-00107-BMW    Doc 1    Filed 01/16/12    Entered 01/16/12 15:05:16    Desc
Main Document     Page 1 of 9

2. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §157(b)(2). This is a core proceeding.

3. Gregory Neal Papakyriakou ("Greg") is the son of the debtors. Greg is an insider as that term is defined in 11 U.S.C. §101(31).

4. Marc Robert Papakyriakou ("Marc") is the son of the debtors. Marc is an insider as that term is defined in 11 U.S.C. §101(31).

5. During 2007, the debtors' financial affairs began a downward spiral. For example, due to a downturn in the economy, the debtors reported that they were forced to sell off jewelry worn by Roxane Papakyriakou to pay ongoing business expenses. At the same time, the debtors reported that they had fake jewelry manufactured for Roxane Papakyriakou to wear to maintain the appearance of financial success.

6. On or about October 10, 2007, the debtors received a 17 page letter from attorneys representing investors in various real estate projects operated by the debtors outlining a variety of insider transactions regarding those investments and demanding information regarding those investments and the transactions. By November 15, 2007, the information demanded had not been provided by the debtors and the investors advised of their intent to proceed with litigation. By February 21, 2008, the investors had filed a complaint with the Maricopa County Superior Court.

7. On March 11, 2008, a promissory note owed to Security Pacific Bank, which was guaranteed by the debtors, went into default.

2

8. On March 25, 2008, two more promissory notes owed to Security Pacific Bank, which were guaranteed by the debtors, went into default.

9. On April 1, 2008, a promissory note owed to Sterling Savings, which was guaranteed by the debtors, matured and went unpaid.

9.A. On May 22, 2008, additional investors in real estate projects operated by the debtors sent a 10 page demand letter outlining a variety of claims against the debtors due to fraud, insider transactions and other misconduct of the debtors.

10. On June 14, 2008, a promissory noted owed to Stearns Bank, which was guaranteed by the debtors, matured and went unpaid.

11. Not later than May 12, 2008, the debtors began to dispose of their assets. The following transfers occurred:

   A. From an entity they owned and controlled, Papas Investment Limited Partnership ("PILP"), the debtors wrote a check for $10,000.00 to make a deposit for the purchase of a house at 4041 E. Cortez, Phoenix, AZ (the "Cortez house"). At closing, the house was titled in the name of Cobea Associates, LLC ("Cobea"), an entity ostensibly owned by Alex Papkyriakou's sister who lives in South Africa. The debtors and the defendants (when they are home from college) live in that house.

   B. On June 20, 2008, the debtors transferred $369,000.00 from PILP to Chicago Title to close the purchase of the Cortez house.

   C. On June 30, 2008, the debtors transferred their house in Paradise Valley, and all of its contents, to Cobea. The

3

debtors then, ostensibly, leased back the house and its contents from Cobea.

  D. On June 30, 2008, the debtors caused PILP to transfer a business entity owned by PILP, Horseshoe PV Realty Investments, LLC ("HPV"), to Cobea. At the time of the transfer, HPV owned a free and clear commercial building purchased for $2.7 million in cash on December 14, 2006. HPV also owned collector automobiles.

  E. On July 31, 2008, the debtors caused PILP to transfer free and clear real property in Scottsdale, Arizona worth $500,000.00 to Cobea.

  F. On August 6, 2008, the debtors caused PILP to transfer a multi-million dollar house and a condominium owned by PILP in California to Cobea.

  12. In the meantime, additional loan defaults continued to occur and litigation was filed against the debtors. The following events occurred:

  A. On July 1, 2008, a promissory noted owed to Sand Capital, which was guaranteed by the debtors, went into default.

  B. On July 29, 2008, a promissory noted owed to First Fidelity Bank, NA, which was guaranteed by the debtors, matured and went unpaid.

  C. On September 1, 2008, the payment due on a promissory note owed to First Horizon Home Loans, a division of First Tennessee Bank, a debt guaranteed by the debtors, went unpaid, causing a default in the loan.

4

D. On September 1, 2008, the payment due on a second promissory noted owed to Sand Capital, LLC, a debt guaranteed by the debtors, went unpaid, causing a default in the loan.

E. On October 1, 2008, the payment due on a promissory noted owed to Evergreen Environmental Development Corp., LLC, a debt guaranteed by the debtors, went unpaid, causing a default in the loan.

F. On October 22, 2008, a third group of investors in the debtors' real estate projects, the Goodman family, demanded to see documents related to those investments. The documents were not provided and a lawsuit was filed on February 18, 2009.

G. On October 31, 2008, a promissory note owed to Stearns Bank, NA, a debt guaranteed by the debtors, went into default.

H. On November 3, 2008, the payment due on a promissory note owed to Bank of Hemet, a debt guaranteed by the debtors, went unpaid, causing a default in the loan.

I. On November 14, 2008, two loans owed to Bank of Oklahoma, which were personally guaranteed by the debtors, went into default.

J. On November 26, 2008, the debtors were sued in the Maricopa County Superior Court by Lenore Schupak et al. for the appointment of a receiver, an accounting and related relief.

K. On December 11, 2008, a promissory note owed to Brown Retail, LLC, a noted guaranteed by the debtors, went into default.

5

L. On January 26, 2009, three separate lawsuits were filed by Bank of Oklahoma, NA due to defaults on promissory notes owed to the bank, each of which were guaranteed by the debtors.

13. As part of their scheme to denude themselves of their assets so that their creditors could not recover, the debtors concocted a debt to Greg and Marc, as follows:

A. First, the debtors fabricated an alleged debt owed by PILP to Greg and Marc in the amount of $1,913,900.00.

B. Then, the debtors purported to pay the debts ostensibly owed to Greg and Marc by PILP by agreeing to transfer the debtors' interest in BPRE Holding Company ("BPRE") to Greg and Marc and personally signing a promissory note to Greg and Marc for $871,618.00.

C. Finally, Greg and Marc purported to rescind the transfer of BPRE to them, and the debtors agreed to pay Greg and Marc another $1,042,281.00. As a result, the alleged debt of $1,913,900.00, which was ostensibly owed to Greg and Marc by PILP, was transformed into two promissory notes from the debtors, one for $871,618.00 and one for $1,042,281.00, which were now owed to Greg and Marc by the debtors.

14. The debtors then began to transfer cash to Greg and Marc as follows:

A. On August 8, 2008, the debtors received a refund of a deposit in the amount of $100,000.00. Five days later, on August 13, 2008, the debtors transferred $15,000.00 to Greg and $20,000.00 to Marc.

B. On February 10, 2009, the debtors received a federal income tax refund in the amount of $514,458.66 and deposited that check

6

into their account at Compass Bank. Instead of paying their other creditors, the debtors, on February 11, 2009, transferred $200,000.00 of the tax refund to Greg and $200,000.00 to Marc.

C. On March 9, 2009, less than 30 days later, the debtors transferred another $100,000.00 from the half million dollar tax refund, this time $50,000.00 to Greg and $50,000.00 to Marc.

D. On November 2, 2009, the debtors received a second income tax refund, this time for $638,294.41. Again, instead of paying their other creditors, the debtors, on the same day, transferred $85,000.00 of the tax refund to Greg and $105,000.00 to Marc. At the same time, the debtors transferred $400,000.00 of the refund to Cobea.

E. On January 13, 2010, the debtors transferred $10,000.00 to Greg and $10,000.00 to Marc.

F. On March 30, 2010, the debtors received a third income tax refund, this time for $75,390.00. Again, instead of paying their other creditors, the debtors, on the very next day, transferred $65,000.00 of the tax refund to Marc.

15. These transfers of the debtors' assets to Greg and Marc are avoidable by the trustee pursuant to 11 U.S.C. §548(a)(1)(A) as these transfers were made with the actual intent to hinder, delay and defraud the creditors of the debtors.

16. These transfers of the debtors' assets to Greg and Marc are avoidable by the trustee pursuant to 11 U.S.C. §544(a) and A.R.S. §44-1004(A)(1) as these transfers were made with the actual intent to hinder, delay and defraud the creditors of the debtors.

17. These transfers of the debtors' assets to Greg and Marc

7

are avoidable by the trustee pursuant to 11 U.S.C. §544(a) and A.R.S. §44-1005 as the debtors were insolvent at the time of the transfers and did not receive reasonably equivalent value in exchange for the transfers.

18. In the alternative, the transfers to Greg and Marc that occurred less than one year prior to the bankruptcy filing (the payments of $10,000.00 each on January 13, 2010 and the payment of $65,000.00 to Marc on March 30, 2010), are avoidable by the trustee pursuant to 11 U.S.C. §547, as these transfers were made to or for the benefit of insider creditors, on account of antecedent debts, while the debtors were insolvent, and enabled Greg and Marc to receive more than they would in a case under Chapter 7.

19. To the extent that any additional transfers of money or property to the defendants are discovered during the course of this litigation, the trustee also seeks to avoid those transfers pursuant to 11 U.S.C. §544(a) and A.R.S. §44-1004(A)(1), A.R.S. §44-1005 and/or 11 U.S.C. §547.

20. Greg and Marc have filed Claim Nos. 117 and 120 for money allegedly owed to Greg and Marc. Those claims must be disallowed since (a) there is nothing owed to them by the debtors and (b) the claims must be disallowed pursuant to 11 U.S.C. §502(d) unless and until all avoidable transfers to these defendants have been returned to the bankruptcy estate.

**WHEREFORE**, the trustee prays:

A. For the entry of an order avoiding the transfers of the $810,000.00 to Greg and Marc (along with any other transfers of money

8

or property discovered during the course of this litigation) pursuant to 11 U.S.C. §548(a)(1)(A) and/or 11 U.S.C. §544 and A.R.S. §44-1004(A)(1) and/or 11 U.S.C. §544(a) and A.R.S. §44-1005 and/or 11 U.S.C. §547.

    B. For the entry of a judgment against Greg in an amount not less than $360,000.00 and against Marc in an amount not less than $450,000.00 pursuant to 11 U.S.C. §550(a)(1) and/or A.R.S. §44-1007, and for an award of the trustee's costs. In the event of default, the trustee will request costs of $293.00, attorneys' fees of $500.00, along with reasonable costs and attorneys' fees incurred in collection.

    C. For interest on all amounts awarded to the trustee at the federal district court judgment rate from the date of each of the transfers until repayment in full.

    D. For the entry of an order disallowing the proofs of claim filed by Greg and Marc.

    E. For such additional relief as may be allowable at law or in equity.

    DATED January 16, 2012.

***TERRY A. DAKE, LTD.***

By /s/ TD009656
    Terry A. Dake – 009656
    11811 North Tatum Boulevard
    Suite 3031
    Phoenix, Arizona 85028-1621
    Attorney for Trustee

9